[Civ. No. 14371. First Dist., Div. Two. May 8, 1951.]

ANNIE CAMERON, Respondent, v. CITY OF GILROY, Appellant.

Campbell, Hayes & Custer, Robert E. Hayes and Edward J. Niland for Appellant.

Harold Holden and R. G. Wilkens for Respondent.

DOOLING, J.—Respondent, Annie Cameron, received personal injuries when her foot slipped while she was entering a marked crosswalk leading across Monterey Street in the

city of Gilroy. The city of Gilroy had constructed some years before an approach to the crosswalk leading from the theretofore existing sidewalk into the street. The sidewalk level at that point is 10 inches above the street level and the approach, in the form of an arc-shaped ramp, was flush with the sidewalk at its higher end and, in a length of 33 inches, curved downward with an increasing pitch to meet the street level at its lower end. Aptly described by some witnesses as "barrel-shaped," it was constructed of a surface of concrete poured over a curved iron frame. The plaintiff's fall was caused by her foot slipping from under her when she placed it upon the curved surface of the ramp. The court, sitting without a jury, gave plaintiff judgment for damages against the city of Gilroy and the city has appealed.

Photographs of the ramp are in evidence and from a side view it seems obvious that its curved surface as it sloped into the street was not well designed to secure a sure footing for pedestrians. This is supported by the testimony of witnesses that prior to respondent's mishap other persons, particularly women, seeking to use it had lost their footing on its curved surface.

Monterey Street is a state highway and appellant seeks to escape liability on the ground that this ramp being located upon, and a part of, a state highway, respondent city had no legal authority to repair or remove it. In support of this argument appellant relies heavily upon *Gillespie* v. *City of Los Angeles*, 36 Cal.2d 553 [225 P.2d 522]. We have concluded that on its facts this case is not controlled by the Gillespie case.

The ramp in this case was admittedly constructed by the city of Gilroy under the direction of its superintendent of streets. By reason of its shape it was neither designed, nor could it be used, for vehicular travel. The sides of the ramp are vertical and, rising in a curve to a height of 10 inches, it presents an obstacle to vehicular traffic, rather than being designed for its use. It was obviously designed and intended solely for pedestrian travel. A contract between the State Highway Department and appellant city, entered into long after the ramp was in place, was introduced into evidence. This contract is similar in form to the contract considered in the Gillespie case and contains the following provisions:

"There is hereby delegated to the city the maintenance of the areas between curb lines and right of way lines. . . .

"The Department of Public Works hereby delegates to the

city such administrative powers, jurisdiction, and authority as are vested by law in the department to regulate and control the streets constituting the designated State highway routes within the city, in so far as the areas outside the curb lines are concerned.''

The crucial question lies in construing the language ''between curb lines and right of way lines'' and ''outside the curb lines.'' If the ramp upon which respondent fell lay within the area over which ''administrative powers, jurisdiction, and authority'' and ''maintenance'' were delegated by the contract to the city of Gilroy the legal authority of the city to remedy the defect is established.

In the Gillespie case a majority of the court found similar contract language inapplicable to a mountain highway without sidewalks, saying (36 Cal.2d at p. 561): ''Route 156 is a mountain road, lacking the sidewalk area whose maintenance could reasonably be separated from that of the roadway.'' In this sentence the court recognizes that the purpose of these contracts is to reserve to the State Highway Department the control over and maintenance of the roadway, that portion of the highway designed for and used by vehicular traffic, and to delegate to the city like powers and duties over the sidewalk area, that portion of the highway not designed for or used by vehicular traffic but reserved exclusively for pedestrian use. ■ The ''curb line'' as used in these contracts is the line which divides the roadway from the sidewalk, the area used for vehicular traffic from the area set apart exclusively for pedestrian use.

■ A glance at the photographs in evidence makes it clear beyond a doubt that the ramp in question is no more than an extension of the sidewalk. It is neither designed for nor could it be used by vehicles passing along the roadway. Instead it effectively cuts off from vehicular use the area which it occupies. It was clearly designed and constructed solely for pedestrian use. These facts make it clear that it is ''outside the curb line'' in the sense of those words in the contract between the State Highway Department and appellant city.

■ There is a statutory presumption ''that official duty has been regularly performed'' (Code Civ. Proc., § 1963, subd. 15) and we must presume in the absence of contrary evidence that in thus extending the pedestrian or sidewalk area by the construction of this ramp the city officials were acting legally, and with the full consent of the State Highway Department, if the law required such consent. ■ When the contract in

evidence was made the ramp had been in place for a number of years and the contract must be construed in view of that fact, which we must assume to have been within the knowledge of the contracting parties.

■ The fact that the negligence of appellant city inhered in the form of the ramp as designed and constructed is sufficient to charge appellant with notice of its dangerous or defective condition. "The rule is well established that when it is shown that a certain street and sidewalk improvement has been planned by city officers and constructed in accordance with such plan, and that by carrying out the plan a dangerous or defective condition has been created, no further proof is needed to charge the city with notice of that condition." (*Fackrell* v. *City of San Diego,* 26 Cal.2d 196, 203 [157 P.2d 625, 158 A.L.R. 625].)

■ The evidence did not as a matter of law compel the court to find that respondent voluntarily assumed the risk of injury or was guilty of contributory negligence. Respondent testified that she was not in the habit of using this ramp and had not heard of any person who had slipped in attempting to walk on it. The ramp was patently designed for pedestrian traffic and for that purpose alone, and the casual pedestrian would be readily persuaded, without giving the matter further thought, that he might safely use a facility obviously supplied by public authorities for his convenience as a member of the public. The appellant city is in the position of asserting that every pedestrian who accepted its invitation to use this ramp which it designed and constructed for that very use must be held as a matter of law to have assumed the risk of injury. The conduct of a person of ordinary prudence is the legal standard in such cases and the court was well within the bounds of its fact finding power in determining that a person of ordinary prudence would have used this facility under the circumstances. (See *Scholey* v. *Steele,* 59 Cal.App. 2d 402, 406 [138 P.2d 733]; *Singer* v. *Eastern Columbia, Inc.,* 72 Cal.App.2d 402, 412-413 [164 P.2d 531]; Restatement of the Law of Torts, vol. II, § 360, illustration 2.)

■ The claim filed with appellant city did not state the address of the claimant. However it did give the office address of her attorney. This has been held to be a sufficient compliance with the claims statute in that particular. (*Anderson* v. *County of San Joaquin,* 97 Cal.App.2d 330 [217 P.2d 479]; *Stewart* v. *City of Rio Vista,* 72 Cal.App.2d 279 [164 P.2d

274] ; *Uttley* v. *City of Santa Ana,* 136 Cal.App. 23 [28 P.2d 377].)

Judgment affirmed.

Nourse, P. J., and Goodell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 5, 1951.